**UNITED STATES DISTRICT COURT
FOR THE**
**DISTRICT OF MASSACHUSETTS**

CIVIL ACTION #04-12700 RCL

| | |
|---|---|
| **MARILYN SCHLOSSBERG** | * |
| AS ADMINISTRATRIX OF THE | * |
| ESTATE OF FAYE SCHLOSSBERG, | * |
| **MARILYN SCHLOSSBERG,** INDIVIDUALLY, | * |
| **ROBERT S. SCHLOSSBERG,** INDIVIDUALLY, | * |
| and **ALAN G. SCHLOSSBERG,** INDIVIDUALLY | * |
| | * |
| Plaintiffs | * |
| | * |
| v. | * |
| | * |
| **TOWN OF NEWBURY,** | * |
| **ROGER MERRY, CHIEF OF POLICE** in his | * |
| Individual and Official Capacities | * |
| **JOHN R. LUCEY JR.,** in his Individual | * |
| and Official Capacities | * |
| **MICHAEL J. FRAYLER,** in his Individual | * |
| and Official Capacities | * |
| **PEGGY OLSON,** in her Individual and | * |
| Official Capacities, | * |
| **KEVIN MARTIN,** in his Individual and | * |
| Official Capacities. | * |
| Defendants | * |
| | * |

**PLAINTIFF'S OPPOSITION TO DEFENDANT, KEVIN MARTIN'S
MOTION TO DISMISS PURSUANT TO FED.R.CIV.P. 12(B)(6)**

## I. BACKGROUND

On December 21, 2001, the decedent, Faye Schlossberg was

involved in a single car accident in the town of Newbury,

Massachusetts.  Ms. Schlossberg's vehicle had gone off the road

and struck a utility pole.  Officers Lucey and Frayler of the

Newbury Police Department arrived at the scene of the accident.

Officers Lucey and Frayler ordered Schlossberg out of her vehicle

and placed her under arrest for suspicion of operating under the

influence of alcohol or drugs.

MICHAEL D. RUBENSTEIN
ATTORNEY AT LAW

1725 REVERE BEACH PARKWAY
EVERETT, MASSACHUSETTS 02149
.TEL· (617) 387-3548
X·(617) 387-4416

At the time of their initial contact with Ms. Schlossberg,
Officers Lucey and Frayler reported that her speech was slurred,
slow and unintelligible.  Officers Lucey and Frayler also
reported that Schlossberg was extremely unsteady on her feet and
was swaying.  After Officers Lucey and Frayler made these
observations, Schlossberg was transported in custody to the
Newbury police station and booked by Off. Lucey.

Officer Lucey then contacted Officer Kevin Martin of the
Newburyport Police Department and requested that he come to the
Newbury Police Station and examine Faye Schlossberg, due to his
particular expertise and certification in D.R.E. (Drug
Recognition Evaluation).

Officer Martin conducted a medical examination of Faye
Schlossberg which lasted approximately 40 minutes.  During that
medical examination, Officer Martin (according to his report)
made numerous observations about Ms. Schlossberg which would have
led a person of ordinary intelligence to believe that Ms.
Schlossberg was overdosing on narcotic analgesics and required
medical attention.  See report of Dr. David A. Rigle, Medical
Director and Chief Forensic Consultant for Forensic Medical
Consulting, P.C. which is attached hereto as Exhibit 1 and is
incorporated herein by reference.  See Dr. Rigle's curriculum
vitae, which is attached hereto as Exhibit 2 and is incorporated
herein by reference.

MICHAEL D. RUBENSTEIN
ATTORNEY AT LAW

1725 REVERE BEACH PARKWAY
EVERETT, MASSACHUSETTS 02149
TEL: (617) 387-3548
FAX: (617) 387-4416

- Page 2 -

Officer Martin acted with reckless indifference to the medical needs of Faye Schlossberg by incarcerating her rather than taking her to a hospital for evaluation and treatment of a drug overdose. As an officer trained in drug recognition and evaluation, Officer Martin clearly was aware that opiate analgesic intoxication (as he diagnosed Ms. Schlossberg during his examination), is a very dangerous condition that poses a significant risk of death without medical treatment. See report of Dr. Rigle, (Exhibit 1).

Officer Martin was aware at the time of his examination that Ms. Schlossberg had a history of drug overdoses, and despite that knowledge, and despite knowing that she was overdosing on opiates at the time of his examination, Officer Martin with deliberate indifference to the medical needs of Ms. Schlossberg, failed to see that she received proper medical treatment. That reckless indifference to the obvious medical needs of Ms. Schlossberg was the direct and proximate cause of her death. The need for medical treatment under these circumstances would have been obvious to even a lay person, let alone a person with specialized training such as Officer Martin. See report of Dr. Rigle, (Exhibit 1).

## II. STANDARD FOR GRANTING MOTION TO DISMISS

MICHAEL D. RUBENSTEIN
ATTORNEY AT LAW
1725 REVERE BEACH PARKWAY
EVERETT, MASSACHUSETTS 02149
TEL: (617) 387-3548
FAX: (617) 387-4416

A motion under Rule 12(b)(6), like the traditional demurrer, tests the legal sufficiency of the complaint, counterclaim, or

cross-claim.  It should be allowed if and only if, "it appears to a certainty that [the claiming pleader] is entitled to no relief under any state of facts which could be proved in support of the claim.  **2A Moore, Federal Practice 2245.**

When a defendant moves for summary judgment based on the doctrine of qualified immunity, the court must review the facts in the light most favorable to the plaintiff.  **Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87 (1994);**  See also **Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990).**

If the movant for summary judgment shows there is an absence of evidence to support non-moving party's position, the burden then shifts to the non-moving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the non-moving party.  The non-movant cannot simply rest upon mere allegations but must adduce specific, provable facts which establish that there is a triable issue.  **Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.**

## III. LEGAL ANALYSIS

**A. Count XXVI - The Plaintiffs have alleged sufficient facts that Officer Martin violated the constitutional rights of Faye Schlossberg by engaging in deliberate indifference to her medical needs.**

MICHAEL D. RUBENSTEIN
ATTORNEY AT LAW

1725 REVERE BEACH PARKWAY
EVERETT, MASSACHUSETTS 02149
TEL. (617) 387-3548
FX: (617) 387-4416

When liability for pretrial detainee's serious harm or death, including suicide, is at issue in a Sec. 1983 case, plaintiff must demonstrate "deliberate indifference" by showing: unusually serious risk of harm (self-inflicted harm in suicide case), defendant's actual knowledge of (or at least, willful blindness to) that elevated risk, and defendant's failure to take obvious steps to address that known, serious risk; risk, knowledge and failure to do obvious, taken together, must show that defendant is "deliberately indifferent" to harm that follows. **42 U.S.C.A. Sec. 1983;** **Manarite v. City of Springfield, 957 F.2d 953.**

When ruling on a 12(b)(6) motion, the Court must view the record in the light most favorable to the plaintiffs and indulge in all inferences favorable to them. **Space Master Int'l. Inc. v. Worcester, 940 F.2d 16, 17 (1st Cir.1991).** The materiality of a fact is determined according to the substantive law that governs the dispute. **Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).** A material fact creates a genuine issue for trial "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." **Id.**

The Supreme Court has made clear that Section 1983 permits recovery for loss of life (or for serious physical harm) only where the defendant acts intentionally, or with an analogous state of mind usually described as **"deliberate indifference"** to

MICHAEL D. RUBENSTEIN
ATTORNEY AT LAW
1725 REVERE BEACH PARKWAY
EVERETT, MASSACHUSETTS 02149
TEL: (617) 387-3546
VX: (617) 387-4416

deprivation of the victim's constitutional rights.  **Wilson v. Seiter,** **501 U.S. 294, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991).**  That standard applies in Fourteenth Amendment municipal liability, police denial of medical treatment cases as well.  **Estelle v. Gamble, 429 U.S. 97, 104-106,  97 S.Ct. 285, 291-292, 50 L.Ed.2d 251 (1976).**

Although "deliberate indifference" has been held to mean more than ordinary negligence, some courts have held that a showing of gross negligence is adequate.  **Daniels v. Williams, 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986);** See also **DeRosiers v. Moran, 949 F.2d at 19 (1st Cir.1991)** which suggests that a finding of deliberate indifference may lie where harm was easily preventable.

Substantive protections of due process clause limit what a state may do regardless of what procedures are followed; substantative due process is a source of rights where the conduct complained of shocks the conscience or offends community's sense of fair play and decency.  U.S.C.A. Const. Amend. 14,  **Miga v. City of Holyoke, 398 Mass. 343, 497 N.E. 2d. 10.**  Copy attached as Exhibit 3 and incorporated herein by reference.

In the <u>Miga</u> case, the Supreme Judicial Court of Massachusetts held that evidence establishing that police officers placed pretrial detainee in a cell unattended when she was obviously intoxicated and unconscious, failed to follow

MICHAEL D. RUBENSTEIN
ATTORNEY AT LAW
1725 REVERE BEACH PARKWAY
EVERETT, MASSACHUSETTS 02149
TEL: (617) 387-3548
FAX: (617) 387-4416

department rules relating to the care and monitoring of unconscious, intoxicated and suicidal persons in their custody, and ignored pleas for help when detainee was making preparations to hang herself supported a finding that the officers' conduct constituted deliberate indifference to serious needs of detainee in violation of detainee's rights to substantive due process.

In **Consolo v. George, 58 F.3d 791, (1995)** the United States Court of Appeals, 1st Circuit, held that whether or not a police officer acted unreasonably in not seeking medical treatment for arrestee before bringing him to booking room, as would preclude qualified immunity from claim that officers were deliberately indifferent to arrestee's medical needs, was for jury. The court held in that case also that whether or not a police officer's deliberate indifference to the medical needs of an arrestee caused the arrestee's medical condition to worsen or left him in pain and suffering for longer period of time than would otherwise have been the case had he been afforded prompt medical treatment was an issue for the jury.

Here, the constitutional standard is clear. Since at least 1983 there has been no doubt that a pre-trial detainee is entitled to medical attention for serious medical needs under the due process clause of the Constitution. See, **City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983-84, 77 L.Ed.2d 605 (1983).** Applying that legal standard to this case, there is ample evidence that given

MICHAEL D. RUBENSTEIN
ATTORNEY AT LAW
1725 REVERE BEACH PARKWAY
EVERETT, MASSACHUSETTS 02149
TEL: (617) 387-3546
FAX (617) 387-4416

- Page 7 -

Schlossberg's obvious condition at the time that Officer Martin conducted his examination, he acted unreasonably in not seeking medical treatment for Schlossberg on the night in question. **Consolo, supra at 794.**

The facts of this case are analogous to **Miranda v. Munoz, 770 F.2d 255, 259 (1st Cir. 1985),** in that the medical attention given to a pre-trial detainee was so inadequate that it resulted in death and constituted deliberate indifference.   The Due Process Clause requires that the government provide medical care to pretrial detainees.   **Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990).**  Officials violate this requirement only if they exhibit deliberate indifference to **"serious medical needs"** Id.  A serious medical need is one diagnosed by a physician as mandating immediate treatment, or one that is "so obvious"  that a layman would easily recognize the necessity for medical treatment. Id.  Here, the need for medical treatment was so obvious, that even a layman would have been easily able to recognize same.  Officer Martin is not a layman, but has specialized training in this area.  As such, the need for medical treatment should have been even more obvious to him, and his failure to provide such medical treatment to Schlossberg clearly constitutes deliberate indifference to her medical needs.

When police or prison officials intentionally place prisoners in dangerous circumstances, or when they intentionally ignore a prisoner's serious medical needs, or when they are

MICHAEL D. RUBENSTEIN
ATTORNEY AT LAW
1725 REVERE BEACH PARKWAY
EVERETT, MASSACHUSETTS 02149
TEL: (617) 387-3548
'X: (617) 387-4416

deliberately indifferent to either the prisoner's health or safety, they violate the Constitution.  **Cortes-Quinones v. Jimeniz-Nettleship, 842 F.2d. 556.**  Although courts have described "deliberate indifference" to a prisoner's serious medical needs or prisoner's health or safety in various ways, the term at a minimum encompasses acts or omissions so dangerous in respect to health or safety that the police officer or prison official's knowledge of the risk could be inferred.  Id.

## Conclusion

The Plaintiffs have met their burden of establishing that there are clearly triable issues of fact as to whether or not Officer Martin violated the constitutional rights of Faye Schlossberg by engaging in deliberate indifference to her medical needs on the night in question.  The Plaintiff has demonstrated that there was an unusually serious risk of harm in this case, that Officer Martin had actual knowledge of that elevated risk , and that his failure to take obvious steps to address that known, serious risk constituted deliberate indifference to the medical needs of Faye Schlossberg and that harm resulted due to that deliberate indifference on the part of Officer Martin.

The Defendant's argument that he is entitled to qualified immunity due to his position as a police officer exercising discretionary functions does not apply in this case, as the Plaintiffs have show a triable issue of fact that the Defendant

MICHAEL D. RUBENSTEIN
ATTORNEY AT LAW
1725 REVERE BEACH PARKWAY
EVERETT, MASSACHUSETTS 02149
TEL: (617) 387-3548
FAX: (617) 387-4418

engaged in "deliberate indifference", and such issue must be
decided by a jury.

The Defendant's motion relies heavily on the fact that the
Plaintiffs used the word "negligent" numerous times in their
complaint, instead of the words "deliberately indifferent", but
such a scrivener's error should not be the basis of depriving the
Plaintiffs of their right to have this matter heard on the
merits.

For the foregoing reasons, the Plaintiffs oppose the
Defendant's motion, and move that it be denied.

Dated: 5/22/05            Marilyn Schlossberg, Administratrix
                          of the Estate of Faye Schlossberg, et al
                          By their attorney,

                          *Michael D. Rubenstein*

                          Michael D. Rubenstein, Esq.
                          1725 Revere Beach Parkway
                          Everett, MA   02149
                          (617) 387-3548
                          B.B.O. #545358

I HEREBY CERTIFY THAT I HAVE SERVED
A TRUE COPY OF THIS DOCUMENT BY
MAIL ON ALL PARTIES OF RECORD.

*Michael D. Rubenstein*

MICHAEL D. RUBENSTEIN, ESQ.
DATE:   5/22/05

MICHAEL D. RUBENSTEIN
ATTORNEY AT LAW

1725 REVERE BEACH PARKWAY
EVERETT, MASSACHUSETTS 02149
TEL: (617) 387-3548
FAX: (617) 387-4416

*Forensic Medical Consulting P.C.*

*580 Carr Street / East Syracuse, New York 13057 (315) 426-1250 fax 426-1240*

May 16, 2005

Michael D. Rubenstein, Esquire
1725 Revere Beach Parkway
Everett, MA 02149

VIA FEDEX

**Re: Faye Schlossberg (deceased)**

Dear Attorney Rubenstein:

I have reviewed the materials you forwarded to me concerning Faye Schlossberg, including her past medical records from Anna Jaques Hospital from 1999, 2000 and 2001, as well as the records from the district office of the District Attorney for the Eastern District of the Commonwealth of Massachusetts accompanying the cover letter of First Assistant District Attorney, Robert N. Weiner, dated February 14, 2002, and the records of the Commonwealth of Massachusetts Office of the Medical Examiner concerning the autopsy of Faye Schlossberg by William Zane, M.D. on December 28, 2001.

Ms. Schlossberg was arrested for operating a vehicle under the influence of drugs on December 21, 2001 at approximately 11:30 p.m. The records indicate that Newbury Police Department Officer Michael J. Frayler and Patrolman John Lucey responded to a single car motor vehicle accident that occurred on Scotland Road in the town of Newbury. Ms. Schlossberg was the driver and only occupant of a blue Mercury Grand Marquis that crossed over the northbound shoulder of the road and struck a utility pole. When Ms. Schlossberg was confronted by the police officers responding to the accident, she was observed fumbling through papers in the vehicle and she appeared somewhat disoriented. The officers noted that she had slurred speech and difficulty standing with balance problems and she was extremely unsteady on her feet swaying back and forth when attempting to ambulate. The officers noted that she did not smell of alcoholic beverages but appeared intoxicated and therefore they believed she was under the influence of drugs. She was accordingly transported by Patrolman John Lucey to the police station for booking. Since she appeared to be under the influence of drugs, Patrolman Lucey contacted Newburyport Officer Kevin Martin because of his particular expertise and certification in D.R.E. (Drug Recognition Evaluation). It was requested of Officer Martin that he evaluate Ms. Schlossberg.

Forensic Medical Consulting, P.C.
Michael D. Rubenstein, Esquire
Re: Faye Schlossberg
May 16, 2005
Page 2 of 4

      The evaluation by Kevin Martin of Ms. Schlossberg occurred on December 22, 2001 beginning at 20 minutes past midnight and ending at 1:01 a.m. His conclusion was that she was under the influence of narcotic analgesics. His examination and evaluation disclosed that her coordination was poor, that she had slurred speech and that her pupils had little to no reaction to light. Her pupils were described as very small, ranging from 2.0 to 3.0 millimeters in diameter depending on lighting conditions; including room light, direct light, darkness and indirect light. Ms. Schlossberg showed loss of balance and very compromised coordination in attempting to walk heel-to-toe for nine steps and return as a part of the standard drug intoxication evaluation. Officer Martin also noted that her oral cavity had a thick, gray coating. However, as part of his evaluation, Officer Kevin Martin did not obtain any toxicology samples as he claims in his report that the Newbury Police Station did not have any storage or booking facility for urine samples. Ms. Schlossberg was accordingly maintained at the Newbury Police Station and placed in cell 5, apparently one reserved for females and juveniles. Ms. Schlossberg was processed by Officer Peggy Olson and observed overnight, and in her statement Officer Olson reports that she had several contacts with Ms. Schlossberg during the early hours of December 22, 2001. Even though Officer Olson goes through some of the details of her search during the booking process to which Ms. Schlossberg was subjected, Ms. Schlossberg was apparently able to transport a medication vial into the cell and was provided water by Ms. Olson.

      The last contact between Officer Olson and Ms. Schlossberg reportedly occurred at about 1:15 a.m. on December 22, 2001. At that time, she notes that she had provided two blankets and two pillows for the comfort of Ms. Schlossberg as well as some water. Ms. Schlossberg commented that the water tasted sweet but attributed it to Chinese food she had been eating earlier that night prior to the accident.

      It is reported that the Watchtour monitor was utilized so that they could hear inside the cell where Ms. Schlossberg was kept. It is reported that Ms. Schlossberg snored throughout the night. At the request of Ms. Schlossberg, Officer Olson went to awake her to make calls for bail soon after 7 a.m. on December 22, 2001. It was at that time that they noted that she was unresponsive. A pulse was initially present at the carotid and there was spontaneous shallow breathing. However, after a short interval breathing stopped and emergency medical services were summoned. Ms. Schlossberg was transported to Anna Jaques Hospital and on admission, she was noted to be completely unresponsive without spontaneous respirations or heartbeat. Emergency resuscitative efforts were successful in restoring a perfusing cardiac rhythm despite the fact that her pH was excessively low and she had undergone a rather excessive amount of brain anoxia. On December 26, 2001, at 2:15 p.m. Ms. Schlossberg was pronounced brain dead and subsequently subjected to organ donation.

Forensic Medical Consulting, P.C.
Michael D. Rubenstein, Esquire
Re: Faye Schlossberg
May 16, 2005
Page 3 of 4

     The autopsy report notes that Ms. Schlossberg was autopsied on Friday, December 28, 2001 by William Zane, M.D. There were no significant findings. However, antemortem blood samples from December 22, 2001 taken at 1:40 p.m. during the Anna Jaques hospitalization were submitted to toxicology and demonstrated a free codeine level of 900 ng/ml as well as free morphine of 36 ng/ml. These represent extremely excessive levels of opiate analgesics, particularly codeine in the decedent's blood and it is the opiate intoxication that is the cause of Ms. Schlossberg's death. Codeine, as well as morphine, are opiate analgesics and as a class of drugs, they cause respiratory depression, which in this case resulted in cerebral hypoxia and cardiac arrest resulting in brain death.

     Assessing the conduct of Officer Kevin Martin, it is my opinion that he acted with reckless disregarding toward the well-being of Ms. Schlossberg by incarcerating her rather than taking her to the hospital for evaluation and treatment of a drug overdose. Patrolman Martin was aware of the fact that Ms. Schlossberg had a negative breath alcohol test and therefore her intoxication was completely due to drugs. As an officer trained in drug recognition evaluation (DRE), he was aware of the fact that opiate analgesic intoxication, as he opines to be the condition of Ms. Schlossberg at the time of his evaluation, is a very dangerous situation that poses risk for death without medical treatment. Further, had Ms. Schlossberg received medical care for her overdose rather than being transported to the police department for lock-up, her changes of surviving the overdose without deficit approach 100%. The drug Narcan could have been administered in a hospital and would have been given to Ms. Schlossberg immediately upon identifying the fact that she was intoxicated by opiates. This would have resulted in immediate reversal of the drug effects, including the respiratory depressant effect. Subsequently, she would have been monitored in the hospital and her outcome, as noted, would have almost certainly resulted in survival with no deficit.

     Of note, Ms. Schlossberg had prior to December 22, 2001, two other drug overdoses during the past three months and additionally another two overdoses during the years 1999 and 2000. In particular, on October 25, 2001, Ms. Schlossberg overdosed on Soma; on September 22, 2001 on Zantac; on September 12, 2000 on Fentanyl; and on February 26, 1999 on Soma again.

     In summary, it is my opinion with reasonable medical certainly that the conduct of Officer Kevin Martin in connection with his evaluation of Ms. Schlossberg on December 22, 2001 was egregious and represents a reckless disregard for her wellbeing. This willful and wanton behavior displayed by Officer Kevin Martin resulted in the death of Ms. Schlossberg, as had he acted appropriately and recommended that she be taken to the hospital for medical evaluation and treatment, Ms. Schlossberg would have survived the incident without deficit. It should be noted that almost all lay people would

**Forensic Medical Consulting, P.C.**
Michael D. Rubenstein, Esquire
Re: Faye Schlossberg
May 16, 2005
Page 4 of 4

understand the dangerousness of narcotic overdose, particularly opiates, when faced with
the diagnosis of narcotic analgesic overdose, as Officer Martin had reached by the
conclusion of his evaluation at 1:01 a.m. on December 22, 2001.

     If you have any questions of if I can be of any further assistance to you please do
not hesitate to contact me.

                        Very truly yours,

                        David A. Rigle, M.D.
                        Medical Director
                        Chief Forensic Consultant
                        Forensic Medical Consulting, P.C.

DAR/tmc

# *Forensic Medical Consulting P.C.*

*380 Carr Street / East Syracuse, New York 13057 (315) 426-1250 fax 426-1240*

## CURRICULUM VITAE

### *DAVID ANTHONY RIGLE, M.D.*

#### Work Address:

David A. Rigle, M.D.
Medical Director and Chief Forensic Consultant
Forensic Medical Consulting, P.C.
380 Carr Street
East Syracuse, New York 13057

#### Communications:

| | |
|---|---|
| Telephone | 315-426-1250 |
| Fax | 315-426-1240 |
| E-mail | drrigle@baldcom.net |

#### Personal:

Date of Birth: 10/02/55
Marital Status: Married
Children:    Four (17, 15, 11, and 3 years of age)

#### High School Education:

Wyoming Seminary College Prep.
Kingston, Pennsylvania
1969-1973

*Curriculum Vitae*
*David A. Rigle, M.D.*
*Page 2 of 11*

**College Education:**

Wilkes College
Wilkes-Barre, Pennsylvania
1973 - 1974
Major: Biology
Member of Chemistry Society

King's College
Wilkes-Barre, Pennsylvania
1974 - 1977
Major: Biology
Senior Year: Cum Laude/Magna Cum Laude
Graduation: May 1977, Bachelor of Science, (B.S.)

**Medical School Education:**

Faculte Libre de Medicine
Lille, France
Diplomat of the Committee for International Medical Exchange
September 1977 - May 1984
Degree: Medical Doctor, (M.D.)

**Medical School Distinction (special honors):**
Graduated Magna Cum Laude

**Clinical Experience/Clerkships - France**

General and Vascular Surgery
Saint Philibert Hospital, Lomme, France

Cardiology and Cardiac Intensive Care
Saint Philibert Hospital, Lomme, France

**Clinical Experience/Clerkships - United States**

Internal Medicine
Medical College of Pennsylvania, Philadelphia, Pa.

Gastroenterology
Medical College of Pennsylvania, Philadelphia, Pa.

*Curriculum Vitae*
*David A. Rigle, M.D.*
*Page 3 of 11*

Emergency Medicine
Medical College of Pennsylvania, Philadelphia, Pa.

General Surgery and Vascular Surgery
Thomas Jefferson University Hospital, Philadelphia, Pa.

Orthopedic Surgery and Hand Surgery
Thomas Jefferson University Hospital, Philadelphia, Pa.

Anesthesia and Postoperative Care
Thomas Jefferson University Hospital, Philadelphia, Pa.

Neurosurgery and Spine Surgery
Thomas Jefferson University Hospital, Philadelphia, Pa.

Neurology
Medical College of Pennsylvania, Philadelphia, Pa.

Obstetrics and Gynecology
Medical College of Pennsylvania, Philadelphia, Pa.

Clinical Pediatrics and Pediatric Surgery
Long Island Jewish - Hillside Medical Center, Long Island, New York

Psychiatry
Eastern Pennsylvania Psychiatric Institute, Philadelphia, Pa.

Physical Medicine & Rehabilitation
Medical College of Pennsylvania, Philadelphia, Pa.

Radiology
Medical College of Pennsylvania, Philadelphia, Pa.

Infectious Disease
Medical College of Pennsylvania, Philadelphia, Pa.

Pathology
Chestnut Hill Hospital, Philadelphia, Pa.

*Curriculum Vitae*
*David A. Rigle, M.D.*
*Page 4 of 11*

### National Medical License Qualification Examinations:

ECFMG: July 1983; Passed first attempt: #0568B, Philadelphia, Pennsylvania
FLEX: June 1985 Passed first attempt,:Minneapolis, Minnesota

### Medical Licenses:

State of Minnesota; August 8, 1985; # 029455-7
State of Maryland; Institutional, 1989
State of New York; July 24, 1990; # 183181

### Doctoral Thesis:

Abdominal Aortic Aneurysms - A Review.
Presented to the Medical Faculty and successfully defended.
Ratified by the Medical Faculty with the special distinction of High Honors,
(Magna Cum Laude).
May 30, 1984; Lille, France.

### Internship:

St. Paul Ramsey Medical Center, St. Paul, Minnesota.
July 1984 - June 1985

### Residency Training: Anatomic and Clinical Pathology

St. Paul Ramsey Medical Center, St. Paul, Minnesota.
July 1985 - December 1988

### Specialized Training: Forensic Pathology, (Fellowship)

Office of the Chief Medical Examiner for the State of Maryland
Baltimore, Maryland
May 1989 - April 1990

### Board Certifications:

Board Certified: Board Certified Diplomate of the A.B.F.E.
Primary division: Forensic
Specialties: Medicine, Pathology and Toxicology, (as of 1994)

*Curriculum Vitae*
*David A. Rigle, M.D.*
*Page 5 of 11*  .

**Board Certifications: (continued)**

American Board of Forensic Medicine, ( as of 1996).
Board Certified Diplomate of The American Board of Forensic Medicine

**Executive Medical Board Appointments:**

Executive Advisory Board
American Board of Forensic Medicine (1995 - Current)

**Medical Publication and Editorial Positions:**

Chief Medical Editor:
Practical Reviews in Forensic Medicine and Sciences, (1997-99)
Continuing medical education (CME) accredited and peer-reviewed
jointly by Albert Einstein College of Medicine and Montefiore Medical Center.

Contributing Editor and Peer-reviewer for publication Submissions:
Forensic Examiner: (1995-present)

Author; Forensic Medicine Certification Review, Forensic Examiner, (1995-1997)

Co-author, Forensic Medicine Column of the Forensic Examiner (2001- present)

**Clinical Appointments Held:**

Emergency Medicine
District Memorial Hospital, Forest Lake, Minnesota
February 1986 - April 1989

Family Practice Medicine
District Memorial Hospital, Forest Lake, Minnesota
February 1986 - April 1989

Emergency Medicine
St. Paul Ramsey Medical Center, St. Paul, Minnesota
August 1985 - February 1986

*Curriculum Vitae*
*David A. Rigle, M.D.*
*Page 6 of 11*

Neonatal Intensive Care
St. Paul Ramsey Medical Center, St. Paul, Minnesota
July 1985 - January 1986

Respiratory Intensive Care
Good Samaritan Hospital, St. Paul, Minnesota
July 1986 - May 1987

**Forensic Appointments Held:**

Anatomic and Clinical Pathology, Consulting Pathologist
United Hospitals, St. Paul, Minnesota, October 1985 - April 1989

Deputy Medical Examiner
Ramsey County Medical Examiner's Office
St. Paul, Minnesota
October 1984 - April 1989

Forensic Consultant - Wisconsin
October 1984 - April 1989

Forensic Resident, (Fellowship)
Office of the Chief Medical Examiner for the State of Maryland
May 1989 - April 1990

Assistant Medical Examiner
Onondaga County Medical Examiner's Office
Syracuse, New York
May 1990 - January 1994

**Forensic Experience:**

Forensic cases reviewed/Consulted on: Approximately 8,500
Forensic Autopsy Experience: Approximately 3,500

**Special Certifications:**

Forensic Anthropology
Smithsonian Institute of Natural History
Washington, D.C., 1990

*Curriculum Vitae*
*David A. Rigle, M.D.*
*Page 7 of 11*

Child Abuse - Detection and Recognition
Department of Health for the State of New York
Syracuse, New York, 1992

## Current Professional Association Memberships:

American College of Forensic Examiners
Active Member

American Association for the Advancement of Science
Active Member

American Chemical Society
Active Member

## National and International Professional Conference Presentations:

(1995) Fourth Annual National Expert Witness and Litigation Seminar
Hyannis, Massachusetts; June 22 and 23, 1995.

*Keynote speaker*
Presenting Expert Testimony: Preparation, Delivery and Admissibility.
Participant of the Expert Panel of Medical and Scientific Advisors.

*Co-Speaker*
Evaluating Toxic Exposures After Daubert.
The Role of the Medical Expert in Toxic Exposure Assessments.

(1997) Annual Scientific Meeting of The American College of Forensic Examiners
San Diego, Ca.; December 12-14, 1996.
Providing Testimony as an Expert Witness.

(1998) Annual Scientific Meeting of The American College of Forensic Examiners
Naples, Florida: October 12-14, 1998.
The Medical Aspects of Toxic Exposure Assessments.

(1999) Annual Scientific Meeting of The American College of Forensic Examiners
New York, New York: October 29 - November 1, 1999.
Forensic Medicine, Toxicology and Pathology -
(Emphasis on) Reactive Airways Dysfunction Syndrome (RADS) and
Occupational Asthma.
(A 3.75 hour CME certified medical and scientific professional workshop.)

*Curriculum Vitae*
*David A. Rigle, M.D.*
*Page 8 of 11*   .

**(2000)** Annual Scientific Meeting of The American College of Forensic Examiners
American Board of Forensic Medicine
Las Vegas, Nevada: October 24 - October 27, 2000
Forensic Medicine Toxicology
Chemical Exposures and Toxic Effects on Humans, a Comprehensive Review
5.50 hr CME certified medical and scientific professional workshop, also CLE approved

**(2000)** Annual Scientific Meeting of The American College of Forensic Examiners
American Board of Forensic Medicine
Las Vegas, Nevada: October 24 - October 27, 2000
Expert Evidence Admissibility in Toxic Exposure Assessments
A 2.0 hour CME certified medical and scientific professional presentation.

**(2000)** Annual Scientific Meeting of The American College of Forensic Examiners
American Board of Forensic Medicine
Las Vegas, Nevada: October 24 - October 27, 2000
Fundamentals of Medical Toxicology
Chemical Toxicants, Drug Reactions and Mixed Drug Interactions
A 2.0 hour CME certified medical and scientific professional presentation.

**(2002)** Annual National Expert Witness and Litigation Seminar, (SEAK)
Hyannis, Massachusetts; June 2002
Causation and Reasonable Certainty
1.5 hrs CME certified, CLE approved .

Expert Opinions: Formulating, Presenting and Defending
1.5 hrs CME certified, CLE approved

**CME Accreditation Monitor Appointments:**

**(1999)** New York State Medical Society Continuing Medical Education (CME) Monitor
Annual Scientific Meeting of The American College of Forensic Examiners,
(joint ACFE/APA national conference)
New York, New York: October 29 - November 1, 1999.

**Special Interests:**
Toxic Exposures
Pharmaceutical Toxicity
Complications of Medical Treatment, including mixed drug interactions
Forensic aspects of Medical Microbiology
Practical application of Human DNA Techniques, Procedures and Interpretation

*Curriculum Vitae*
*David A. Rigle, M.D.*
*Page 9 of 11*

**Publications: Original Contributions, Abstracts, Reviews, Treatises and Editorials**

Rigle, D.A., Dexter, R.D., McGee, M.B., Cardiac Rhabdomyomas Presenting as Sudden Infant Death Syndrome, Journal of Forensic Sciences, Vol. 34 (3), May 1989.

Sawyer, WR and Rigle, DA., Toxic Etiology of Multiple Chemical Sensitivity: Review of Case Histories with Documented Toxic Exposure. Society of Toxicology, The Toxicologist, 15(1), 1995, 228-229.

Rigle, D.A., The Effects of Maternal Cocaine Use on the Human Fetus, abstract presented to the FBI Academy, 1992.

Rigle, D.A., Homicide by Oral Drug Dosing - A report of Two Cases and a Review of the Literature, in preparation.

Rigle, D.A., Presenting Expert Testimony; Preparation and Delivery, Expert Witness Handbook, S.E.A.K., 1995 edition.

Rigle, D.A. and Sawyer, W.R., Evaluation of Toxic Exposures After Daubert, Expert Witness Handbook, S.E.A.K., 1995 edition.

Rigle, D.A., The American Board of Forensic Medicine - On The Cutting Edge, Forensic Examiner, Vol 11-12, 1995.

Rigle, D.A., The O.J. Simpson Trial - A Total Eclipse of Forensic Procedure, Forensic Examiner, Vol. 1-2, 1996.

Rigle, D.A. Expert Evidence Admissibility in the Court. Practical Reviews in Forensic Medicine and Sciences, Vol.1, September 1998, Educational Reviews, Inc.

Rigle, D.A. Death investigation in Canada.(Review Presentation, Critical Assessment and Original Abstract); Practical Reviews in Forensic Medicine and Sciences, Vol.1, September 1998, Educational Reviews, Inc. from Avis, SP. J Forensic Sciences 43(2):377-379.

Rigle, D.A. Can Tampon Use Cause Hymen Changes in Girls Who Have Not Had Sexual Intercourse. (Review Presentation, Critical Assessment and Original Abstract); Practical Reviews in Forensic Medicine and Sciences, Vol.1, September 1998, Educational Reviews, Inc. from Goodyear-Smith FA and Laidlaw TM., Forensic Science International Vol. 94, June, 1998, 147-153.

*Curriculum Vitae*
*David A. Rigle, M.D.*
*Page 10 of 11*

Rigle, D.A. Legal Implications of Birth Videos. (Review Presentation, Critical Assessment and Original Abstract); Practical Reviews in Forensic Medicine and Sciences, Vol.1, October 1998, Educational Reviews, Inc. from Eitel DR, et al., Journal of Family Practice. Vol 46, March, 1998, 251-256.

Rigle, DA. Carbon monoxide Poisoning: Forensic Aspects. Practical Reviews in Forensic Medicine and Sciences, Vol.1, October 1998, Educational Reviews, Inc.

Rigle, DA. Psychological Aspects of Child Abuse for Primary Care Pediatricians. (Review Presentation, Critical Assessment and Original Abstract); Practical Reviews in Forensic Medicine and Sciences, Vol.1, October 1998, Educational Reviews, Inc. from Freitag R., et al., Pediatric Clinics of North America. Vol 45, April, 1998, 391-402.

Rigle, DA and Sawyer WR Carbon Monoxide Toxicity versus Carbon Dioxide Toxicity and their relationship in Attempted Suicide, (interactive editorial)  Practical Reviews in Forensic Medicine and Sciences, Vol.1, November 1998, Educational Reviews, Inc.

Rigle, DA Findings in Gunshot Wounds From Tandem Projectiles. (Review Presentation, Critical Assessment and Original Abstract); Practical Reviews in Forensic Medicine and Sciences, Vol.1, November 1998, Educational Reviews, Inc. from Simmons GT, Journal of Forensic Sciences. Vol. 42, July, 1997, 678-681.

Rigle, DA. Docking Doctors? AMA Eyes Discipline for Doctors Giving 'False' Testimony. (Review Presentation, Critical Assessment and Original Abstract); Practical Reviews in Forensic Medicine and Sciences, Vol.1, December 1998, Educational Reviews, Inc. from Higgins, M., American Bar Association Journal, Vol 82, September, 1998, p20.

Rigle, DA. Medical Misconduct. (Special Article Review Presentation, Critical Assessment and Original Abstract); Practical Reviews in Forensic Medicine and Sciences, Vol.1, December 1998, Educational Reviews, Inc. from The New York State Office of Professional Medical Conduct, November, 1998, 1-3.

Rigle, DA., Immersion Technique for Brain Removal in Perinatal Autopsies. (Review Presentation, Critical Assessment and Original Abstract); Practical Reviews in Forensic Medicine and Sciences, Vol.1, January 1999, Oakstone Medical Publishing, Inc. from Prahlow, AJ. Et al., Journal of Forensic Sciences, (43)5, 1998, 1056-1060.

Clark AD and Rigle DA. The Almost Perfect Crime. Practical Reviews in Forensic Medicine and Sciences, Vol.1, January 1999, Oakstone Medical Publishing, Inc.

Sawyer WR. and Rigle DA. Toxicology of Aromatic Hydrocarbons. Practical Reviews in Forensic Medicine and Sciences, Vol.1, January 1999, Oakstone Medical Publishing, Inc.

*Curriculum Vitae*
*David A. Rigle, M.D.*
*Page 11 of 11*  .

Rigle, DA. The Medical Aspects of Toxic Exposure Assessment. <u>Practical Reviews in Forensic Medicine and Sciences,</u> Vol.1, January 1999, Oakstone Medical Publishing, Inc.

Rigle, DA. Pellet Embolization to the Right Atrium Following Double Shotgun Injury. (Special Article Review Presentation, Critical Assessment and Original Abstract); <u>Practical Reviews in Forensic Medicine and Sciences,</u> Vol 1, April 1999, Oakstone Medical Publishing, Inc. from Pollak S. et al., Forensic Science International, (99)1.

Rigle, DA. Death Over-the-Counter: The Dangers of Ephedrine. (Special Article Review Presentation, Critical Assessment and Original Abstract); <u>Practical Reviews in Forensic Medicine and Sciences,</u> Vol 1, April 1999, Oakstone Medical Publishing, Inc. from Aaron, JL. Trial. Dec. 10, 1997, 61-75

Rigle, DA. Mechanisms of Aortic Injury in Fatalities Occurring in Motor Vehicle Collisions. (Special Keynote Article Review Presentation, Critical Assessment and Original Abstract); <u>Practical Reviews in Forensic Medicine and Sciences,</u> Vol 1, May 1999, Oakstone Medical Publishing, Inc. from Shkrum MJ, et al. Journal of Forensic Sciences. Vol 44(January), 1999, 44-56.

Rigle, DA. Fifth Circuit Extends Daubert to Physicians' Causation Testimony. (Special Article Review Presentation, Critical Assessment and Original Abstract); <u>Practical Reviews in Forensic Medicine and Sciences,</u> Vol 1, June 1999, Oakstone Medical Publishing, Inc. from McMurry K. Trial. 34(November), 1998, 108-109.

Rigle, DA. Untrue Confessions. (Special Article Review Presentation, Critical Assessment and Original Abstract); <u>Practical Reviews in Forensic Medicine and Sciences,</u> Vol 1, August 1999, Oakstone Medical Publishing, Inc. from Hansen, M. Journal of the American Bar Association. Vol. 85 (July), 1999, 50-53.

Rigle, DA. Minimizing Mistakes in Clinical Diagnosis. (Special Article Review Presentation, Critical Assessment and Original Abstract); <u>Practical Reviews in Forensic Medicine and Sciences,</u> Vol 2, September 1999, Oakstone Medical Publishing, Inc. from Ermenc B. Journal of Forensic Sciences. Vol. 44 (4), 1999, 810-813

**References:**

Available Upon Request

Revised: December 2002

Westlaw.

497 N.E.2d 1

398 Mass. 343, 497 N.E.2d 1

(Cite as: 398 Mass. 343, 497 N.E.2d 1)

FOR EDUCATIONAL USE ONLY

Page 1

▷

Supreme Judicial Court of Massachusetts,
Hampden.
Dolores MIGA, individually and as administratrix,
[FN1]

FN1. Of the estate of Sandra J. Smigiel.

v.
CITY OF HOLYOKE et al. [FN2]

FN2. Joseph Dudek and John J. McMullan.
The record indicates in a few places that
McMullan's first name is "Gerald," but we
leave that nicety to the discretion of the trial
judge, if the matter now requires
amendment. The plaintiff's amended
complaint named several other individual
defendants who, like defendants Dudek and
McMullan, were employed by the Holyoke
police department. The plaintiff does not
appeal from the allowance of motions for
directed verdicts on all counts for Harold F.
Skelton, Alan G. Fletcher, and Russell
Paquette. In addition, the plaintiff does not
appeal from directed verdicts and jury
verdicts which disposed of all claims in
favor of defendants James Sullivan, Russell
Labbe, Jean King, and Dennis Egan.

Argued May 5, 1986.
Decided Sept. 2, 1986.

Mother of a pretrial detainee brought suit against the
city, its chief of police, and various police officers
seeking recovery for wrongful death and for the
deprivation of the detainee's civil rights. The
Superior Court, Hampden County, Elizabeth A.
Porada, J., entered judgment in favor of the plaintiff,
and the defendants appealed. The Supreme Judicial
Court, Hennessey, C.J., held that: (1) evidence
supported finding that police officers violated pretrial
detainee's right to substantive due process; (2) claim
under § 1983 for violation of pretrial detainee's right
to substantive due process under Fourteenth
Amendment was not barred by availability of a
remedy for wrongful death under state law; and (3)
trial judge did not err in submitting issue of punitive
damages to the jury.

Affirmed.

West Headnotes

[1] Sentencing and Punishment 🔑1532
350Hk1532 Most Cited Cases
    (Formerly 110k1213.10(1))
Eighth Amendment scrutiny of treatment of persons
in state custody is appropriate only after a state has
complied with constitutional requirements associated
with criminal prosecutions. U.S.C.A. Const.Amend.
8.

[2] Sentencing and Punishment 🔑1433
350Hk1433 Most Cited Cases
    (Formerly 110k1213.11)
Pretrial detainee is not protected by prohibitions
against cruel and unusual punishment found in Eighth
Amendment; rather, where state seeks to impose
punishment without a constitutional adjudication of
guilt, pertinent constitutional guarantee is due process
clause of Fourteenth Amendment. U.S.C.A.
Const.Amends. 8, 14.

[3] Constitutional Law 🔑251
92k251 Most Cited Cases
Substantive protections of due process clause limit
what a state may do regardless of what procedures
are followed; substantive due process is a source of
rights where conduct complained of shocks the
conscience or offends community's sense of fair play
and decency. U.S.C.A. Const.Amend. 14.

[4] Constitutional Law 🔑82(13)
92k82(13) Most Cited Cases
Persons in police custody who have not been
convicted of any crimes retain at least those
constitutional rights that are enjoyed by convicted
prisoners.

[5] Civil Rights 🔑1420
78k1420 Most Cited Cases
    (Formerly 78k242(5), 78k13.13(3))
Evidence establishing that police officers placed
pretrial detainee in a cell unattended when she was
obviously intoxicated and unconscious, failed to
follow department rules relating to care and
monitoring of unconscious, intoxicated, and suicidal
persons in their custody and failed to respond to other
prisoners' efforts to summon help when detainee was
making preparations to hang herself, supported
finding that the officers' conduct constituted

deliberate indifference to serious needs of detainee in violation of detainee's rights to substantive due process. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

## [6] Civil Rights 〇〜1319
78k1319 Most Cited Cases
(Formerly 78k209, 78k13.9)

Claim under § 1983 for violation of pretrial detainee's right to substantive due process under Fourteenth Amendment was not barred by availability of a remedy for wrongful death under state law. M.G.L.A. c. 229, § 2; 42 U.S.C.A. § 1983; U.S.C.A. Const.Amend. 14.

## [7] Civil Rights 〇〜1465(1)
78k1465(1) Most Cited Cases
(Formerly 78k275(1), 78k13.17(7))

Punitive damages are recoverable in a § 1983 suit where defendant's conduct is motivated by an evil motive or intent, or where it involves reckless or callous indifference to plaintiff's federally protected rights. 42 U.S.C.A. § 1983.

## [8] Civil Rights 〇〜1429
78k1429 Most Cited Cases
(Formerly 78k244, 78k13.14)

Issue of punitive damages was properly submitted to jury in § 1983 action alleging a violation of pretrial detainee's right to substantive due process where there was evidence that police officer, who placed intoxicated pretrial detainee in protective custody, violated department regulations clearly

promulgated for safety and protection of detainees by failing to transfer detainee to treatment facility and by placing her in a cell when she was unconscious, and that the house officer on duty ignored other prisoners' cries for help when detainee was making preparations to hang herself and responded with profanity and a racial epithet. 42 U.S.C.A. § 1983.
*344 **2 Harold F. Brunault, City Sol., Harry Zarrow, Worcester, with him, for defendants.

Harold Resnic, Springfield, for plaintiff.

Before *343 HENNESSEY, C.J., and WILKINS, LIACOS, ABRAMS and LYNCH, JJ.

*344 HENNESSEY, Chief Justice.

The city of Holyoke and two of its police officers, Joseph Dudek and John J. McMullan, appeal from Superior Court jury verdicts awarding compensatory and punitive damages for the suicide-by-hanging of

the plaintiff's decedent while in the defendants' protective custody.

The plaintiff, the mother of the decedent, brought suit against the city of Holyoke, its chief of police, and various police officers, seeking recovery for wrongful death, G.L. c. 229, § 2 (1984 ed.), and for the deprivation of the decedent's civil rights, 42 U.S.C. § 1983 (1982). [FN3] Motions by the defendants for *345 directed verdicts and judgments notwithstanding the verdicts were made and denied. On special questions, the jury found that the city was responsible for the death of the plaintiff's decedent and awarded $20,000 damages for wrongful death and $2,100 for funeral and burial expenses. In addition, the jury found that the city was sixty per cent negligent and, therefore, the damage awards were reduced to $12,000 and $1,260, respectively. The jury also found defendants Dudek and McMullan liable under 42 U.S.C. § 1983 (1982), and assessed compensatory damages of $20,000 and punitive damages of $50,000 against each of these defendants. [FN4]

> FN3. The plaintiff's complaint also stated claims for violations of the Massachusetts Civil Rights Act, G.L. c. 12, § 11 (1984 ed.), and for intentional infliction of emotional distress. Directed verdicts were allowed in favor of all defendants on each of these State law claims.

> FN4. In the defendants' brief, only three pages are devoted to argument on the issues presented for appeal. We found the brief woefully inadequate in all respects and at several points in this opinion are compelled to make mention of specific problems caused by this inadequacy.
> The defendants state in their brief that the judge awarded attorney's fees and that they appeal from that award. The briefs and record do not reflect the amount of the award and the record does not include the defendants' notice of appeal, although the filing of the notice is reflected on the Superior Court docket entries. In view of these omissions and the one-sentence mention of the issue in the defendants' brief, we conclude that the defendants' treatment of this issue does not rise to the level of appellate argument as required by Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). See *Langlitz v. Board of Registration of Chiropractors*, 396 Mass.

374, 376 n. 2, 486 N.E.2d 48 (1985).

On appeal, the defendants challenge the denial of their motions for directed verdicts and judgments notwithstanding the verdicts, **3 and the damage awards. Specifically, the defendants contend that the evidence was not legally sufficient to establish a constitutional violation under § 1983, that the existence of an adequate State remedy foreclosed the right to sue for violation of civil rights under § 1983, and that the issue of punitive damages should not have been submitted to the jury. [FN5] We transferred the case here on our own motion and affirm the judgments.

> FN5. In their statement of the issues presented and throughout their brief, the defendants appear to address only matters relating to the judgments against the individual defendants on the § 1983 claims. The defendants in their conclusion, however, also purport to challenge the entry of judgment against the city in the amount of $12,000 for compensatory damages on the plaintiff's wrongful death claim under G.L. c. 229, § 2. This one-sentence challenge to the judgment against the city fails to meet the standards for appellate argument set forth in Mass.R.A.P. 16(a)(4). We decline, therefore, to consider the defendants' perfunctory claim of error regarding the wrongful death judgment against the city.

*346 We summarize the facts. The decedent, Sandra Smigiel (Sandra), had poor mental health and was under care for mental illness continuously from 1974 until her death in September, 1979. She was a certified nurse's aide. Sandra married Daniel Smigiel (Daniel) in February, 1978.

On September 10, 1979, Sandra went to the Holyoke police station and informed a police detective that her husband was threatening to kill himself with a gun. As the detective accompanied Sandra to her home, she informed him that she had a drinking problem and that earlier on the same evening she had been a patient at a local detoxification center. When they arrived at Sandra's residence, the police disarmed Daniel. Daniel then advised the detective to be careful with Sandra, told the detective that Sandra had suicidal tendencies and that she had been hospitalized for that reason. The detective wrote a report regarding Sandra, which was read and signed by Lieutenant James Sullivan of the Holyoke police department.

Eleven days later, on September 21, 1979, Sandra tried unsuccessfully to obtain a drink from a drinking establishment as it was closing. The proprietor followed as Sandra drove away from the bar and observed that Sandra's car was weaving as it proceeded along the road. When Sandra pulled over to the side of the road, the proprietor stopped behind her. He then hailed a passing cruiser, occupied by Lieutenant Sullivan and another officer.

The police officers asked Sandra to get out of her car. Sandra did not respond. The officers turned off the ignition and removed Sandra from the car. She was unable to stand or walk by herself, her breath smelled of alcohol and her speech was slurred. Sandra was able to tell the officers her name and the street where she lived. The officers then drove her there, but went to the wrong house and were told that she did not live at that address. The officers made no attempt to search her pocketbook or otherwise determine her correct address, but instead radioed for another cruiser to take Sandra to the police *347 station. On the way to the police station in the second cruiser, Sandra lapsed into unconsciousness. An officer carried her into the police station, but made no attempt to obtain medical attention for her.

The commanding officer at the police station was defendant John J. McMullan, who had been a police officer for twenty-eight years. He had been off-duty, but had been called to the station to administer a breathalyzer test. McMullan remained while Lieutenant Sullivan, who otherwise would have been commanding officer, was out of the station. The defendant Joseph Dudek was the house officer at the police station on the midnight to 8 *A.M.* shift. He was responsible for checking on prisoners, including female prisoners, although in practice a female dispatcher usually checked on female prisoners.

There was testimony that, at the time Sandra was taken into protective custody, rules and regulations promulgated by the chief of police required: that an attempt be made to bring such a person home prior to calling the treatment center; that at no **4 time should an unconscious person be placed in a cell except on orders of a physician; and that prisoners with known suicidal tendencies be checked at least every half hour.

Sandra arrived at the police station at 3 A.M. McMullan observed her to be in a "very drunken condition," and filled out a protective custody form with her name and address and her husband's name.

McMullan made no attempt to communicate with Sandra's husband. There was evidence that McMullan did not notify the nearest detoxification center. McMullan took no action to obtain proper care and treatment for Sandra even though she was obviously intoxicated and had lapsed into unconsciousness periodically since being taken into custody by the police. There was evidence that McMullan knew that his failure to take these actions was contrary to department regulations. Shortly thereafter, Lieutenant Sullivan returned to the station and McMullan departed.

After Sandra was booked, she again lapsed into unconsciousness. Two other officers carried her, unconscious, downstairs to a cell. Because she thrashed about when they attempted to place her on a bench, they placed her on the concrete floor. **\*348** An officer removed her belt, eyeglasses, and necklace, and checked her pockets.

Subsequently, Sandra began banging on the cell wall, asking for belts or shoelaces from other prisoners, and stating that she would commit suicide with her shirt. A woman in another cell began calling for the police to come down to the cell area to help with the situation. There was evidence that a police officer responded from the stairs with an obscene, racial epithet and that Dudek was the police officer who uttered the response. The woman yelled that Sandra was trying to kill herself; other prisoners also yelled for help. No one came. Defendant Dudek heard the yelling, but made no attempt to find out what was happening. At one point Dudek testified that he told the prisoners to quiet down. At 6 *A.M.* Sandra's body was discovered hanging from the bars of her cell.

*1. Sufficiency of the Evidence Under 42 U.S.C. § 1983.*

In evaluating the judge's denial of the defendants' motions for directed verdicts, and for judgments notwithstanding the verdicts on the § 1983 claims, we view the evidence in the light most favorable to the plaintiff. [FN6] *Michnik-Zilberman v. Gordon's Liquor, Inc.,* 390 Mass. 6, 7 n. 1, 453 N.E.2d 430 (1983). *Uloth v. City Tank Corp.,* 376 Mass. 874, 876, 384 N.E.2d 1188 (1978). We must determine whether "any where in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." *Poirier v. Plymouth,* 374 Mass. 206, 212, 372 N.E.2d 212 (1978). quoting *Raunela v. Hertz Corp.,* 361 Mass.

341, 343, 280 N.E.2d 179 (1972). "That the inferences be reasonable requires that they be based on 'probabilities rather than possibilities' and not the result of 'mere speculation and conjecture.' " *Poirier v. Plymouth, supra,* quoting *Alholm v. Wareham,* 371 Mass. 621, 627, 358 N.E.2d 788 (1976).

> FN6. In reviewing the denial of the defendants' motions for directed verdict and judgment notwithstanding the verdict, we employ the same standard. *Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co.,* 381 Mass. 1, 3, 407 N.E.2d 319 (1980); *D'Annolfo v. Stoneham Hous. Auth.,* 375 Mass. 650, 657-658, 378 N.E.2d 971 (1978).

**\*349** To establish a claim based on 42 U.S.C. § 1983, [FN7] a plaintiff must show that the conduct complained of was committed **\*\*5** by a person acting under color of State law and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). *Temple v. Marlborough Div. of the Dist. Court Dep't,* 395 Mass. 117, 122, 479 N.E.2d 137 (1985). There is no question that defendants Dudek and McMullan were acting under color of State law when Sandra was in the custody of the Holyoke police. Thus, the focus of our inquiry is on whether the defendants violated a right secured by the Constitution or laws of the United States.

> FN7. Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

The plaintiff claims that the conduct of Officers Dudek and McMullan in placing Sandra in a cell unattended when she was obviously intoxicated and unconscious, in failing to attempt to transfer her to a detoxification facility, and in failing to check her

Case 1:04-cv-12700-RCL   Document 23-4   Filed 06/21/2005   Page 5 of 9

497 N.E.2d 1                                    FOR EDUCATIONAL USE ONLY                                    Page 5
398 Mass. 343, 497 N.E.2d 1
**(Cite as: 398 Mass. 343, 497 N.E.2d 1)**

every half hour, in violation of the department rules, resulted in a violation of Sandra's constitutional rights. Further, she alleges that those acts, along with the failure of Dudek to respond to the cries of other prisoners for help, constituted deliberate indifference to serious medical needs of a person in police custody. We conclude that there was sufficient evidence to permit a jury to find a violation of § 1983.

[1][2] In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court of the United States held that deliberate indifference to the serious illness or injury of prisoners constitutes a violation of the Eighth Amendment to the United States Constitution and states a cause of action under § 1983. [FN8] *Id.* at 104-105, 97 S.Ct. at 291-292. Mere \*350 negligent or inadvertent failure to provide medical care to prisoners does not, however, rise to the level of a constitutional violation. *Id.* at 105, 97 S.Ct. at 291. Moreover, Eighth Amendment scrutiny of the treatment of persons in State custody is appropriate only after a State has complied with the constitutional requirements associated with criminal prosecutions. *Ingraham v. Wright*, 430 U.S. 651, 671-672 n. 40, 97 S.Ct. 1401, 1412-1413 n. 40, 51 L.Ed.2d 711 (1977). A pretrial detainee, like Sandra, is not protected by the prohibitions against cruel and unusual punishment found in the Eighth Amendment. *Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983). *Bell v. Wolfish*, 441 U.S. 520, 536-537, 99 S.Ct. 1861, 1872-1873, 60 L.Ed.2d 447 (1979). Rather, "[w]here the State seeks to impose punishment without [a constitutional] adjudication [of guilt], the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." *Ingraham v. Wright, supra. Revere v. Massachusetts Gen. Hosp., supra.*

> FN8. The strictures of the Eighth Amendment were made applicable to the States by the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962). See *Estelle v. Gamble*, 429 U.S. 97, 101, 97 S.Ct. 285, 289, 50 L.Ed.2d 251 (1976). A prisoner has a right to medical care in circumstances when a reasonable person would seek medical care for physical as well as psychological needs. See *Brewer v. Perrin*, 132 Mich.App. 520, 529-530, 349 N.W.2d 198 (1984), and cases cited.

[3][4] The substantive protections of the due process

clause limit what a State may do regardless of what procedures are followed. *Rochin v. California*, 342 U.S. 165, 173, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952). Substantive due process is a source of rights where the conduct complained of shocks the conscience or offends the community's sense of fair play and decency. *Id. White v. Rochford*, 592 F.2d 381, 383 (7th Cir.1979). *Johnson v. Glick*, 481 F.2d 1028, 1032-1033 (2d Cir.1973). *Madden v. Meriden*, 602 F.Supp. 1160, 1166-1167 (D.Conn.1985). While the Eighth Amendment does not serve as a direct source of rights for a person in protective custody, the Federal courts have applied Eighth Amendment analysis by analogy to determine what protections detainees are afforded pursuant to the principles of substantive due process. See, e.g., *Madden v. Meriden, supra* at 1163; *Meshkov v. Abington Township*, 517 F.Supp. 1280, 1284 (E.D.Pa.1981). See also \*\*6*Brewer v. Perrin*, 132 Mich.App. 520, 529 n. 3, 349 N.W.2d 198 (1984). Persons in police custody who have not been convicted of any crimes, therefore, "retain at least those \*351 constitutional rights that [the Supreme Court has] held are enjoyed by convicted prisoners." *Bell v. Wolfish, supra*, 441 U.S. at 535 n. 16, 545, 99 S.Ct. at 1872 n. 16, 1877. *Revere v. Massachusetts Gen. Hosp., supra*, 463 U.S. at 244, 103 S.Ct. at 2983. See *Johnson v. Glick, supra* at 1032 (it would be absurd to hold that a pretrial detainee has less constitutional protection against acts of prison guards than one convicted of a crime); *Brewer v. Perrin, supra* (same).

[5] Applying the substantive due process standard informed by Eighth Amendment principles [FN9] to the facts of this case, we conclude that there was sufficient evidence here to permit a jury to find that the defendants acted with deliberate indifference to Sandra's medical needs. From the circumstances surrounding McMullan's failure to obtain proper care for Sandra when she was brought to the station, even though she was obviously intoxicated and had difficulty remaining conscious, the jury could have concluded that McMullan was deliberately indifferent to her serious medical needs. The failure of both defendants to follow department rules relating to the care and monitoring of unconscious, intoxicated, and suicidal persons in their custody when faced with an obviously intoxicated and unconscious person, defendant Dudek's profane and racially insulting verbal response to the efforts of other prisoners to summon help when Sandra was making preparations to hang herself, and Dudek's blatant disregard of the warnings of other prisoners, certainly rise to the level of constitutional violation. \*352 The Holyoke police

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

department rules specifying the care and monitoring intoxicated, unconscious, and suicidal persons in custody should receive dictate the minimum level of care to which standards of basic human decency entitle such persons. A jury could find that the defendants' failure to meet these standards and to respond to cries for help was more than mere negligence, that it was shocking to the conscience, and that it constituted deliberate indifference to the serious needs of a detainee in violation of Sandra's rights to substantive due process. The judgments based on the jury verdicts must stand.

> FN9. In instructing the jury that, in order for the defendants to be held liable for a violation of § 1983, the plaintiff must demonstrate that the defendants acted with deliberate indifference to Sandra's serious physical and mental medical needs, the judge employed the Eighth Amendment standard without direct reference to the standards under substantive due process analysis. This instruction was essentially correct because, as we have mentioned earlier in this opinion, the substantive protections afforded detainees under the due process clause are equivalent to the protections enjoyed by convicted prisoners pursuant to the Eighth Amendment. *Bell v. Wolfish, supra*, 441 U.S. at 545, 99 S.Ct. at 1877. *Revere v. Massachusetts Gen. Hosp., supra*, 463 U.S. at 244, 103 S.Ct. at 2983. Even if the instruction were error, the defendants failed to object to this aspect of the instruction and have thus waived any right to appeal based on such error. See Mass.R.Civ.P. 51(b), 365 Mass. 816 (1974). See *Webster v. Kowal*, 394 Mass. 443, 446 n. 6, 476 N.E.2d 205 (1985); *Cassamasse v. J.G. Lamotte & Son*, 391 Mass. 315, 320, 461 N.E.2d 785 (1984).

### 2. *Availability of State Remedy.*

[6] The defendants argue that the availability of a State remedy under G.L. c. 229, § 2, for the wrongful death of the decedent precludes an action against the police officers under 42 U.S.C. § 1983. Even assuming that the wrongful death recovery against the city provides an adequate State remedy for the police officers' actions in this case, [FN10] we conclude that the plaintiff's **7 claims under § 1983 are not barred as a matter of law.

> FN10. We note that direct recovery against

the police officers under G.L. c. 229, § 2, is barred by the Massachusetts Torts Claims Act, G.L. c. 258, § 2 (1984 ed.), and that the plaintiff's action for wrongful death lies only against the city of Holyoke.

In addition, we express some doubt as to whether the plaintiff's recovery for wrongful death may seriously be considered an adequate remedy for the police officers' unconstitutional treatment of the decedent. Recovery for wrongful death represents damages to the *survivor* for the loss of value of the decedent's life, including but not limited to compensation for loss of the decedent's expected net income, services and companionship. G.L. c. 229, § 2. The plaintiff's claim under 42 U.S.C. § 1983 seeks recovery on behalf of the *decedent* for the police officers' deprivation of her right to substantive due process under the Fourteenth Amendment. These remedies, though they may be parallel, are sufficiently distinct to counter any argument of double recovery. See *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir.1980) (public school student's substantive due process claim as to corporal punishment is quite distinct from claim of assault and battery under State tort law).

In *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Supreme Court upheld a civil rights action under the predecessor statute to 42 U.S.C. § 1983 against Chicago police officers for an unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments. The Court explicitly rejected the *353 defendants' argument that, because State law provided a remedy for the defendant's unlawful conduct, the plaintiff could not recover under the Federal law. "It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." *Id.* at 183, 81 S.Ct. at 482.

The defendants' argument that the plaintiff's § 1983 claim is barred by the availability of a State remedy under G.L. c. 229, § 2, is based upon an incorrect reading of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). In *Parratt*, a Nebraska prison inmate brought an action under 42 U.S.C. § 1983, alleging that State officials who had lost his hobby kit had deprived him of property without due process of law in violation of the

Fourteenth Amendment. The Supreme Court agreed that the plaintiff had been deprived of property, *id.* at 536-537, 101 S.Ct. at 1913-1914, but concluded that this deprivation was not without "due process of law." *Id.* at 540-544, 101 S.Ct. at 1915-1917. The Court reasoned that because a predeprivation hearing is not feasible when deprivations of property are affected through random and unauthorized acts of State employees, the availability of a postdeprivation remedy under Nebraska's Tort Claims Act satisfied the due process requirements of the Fourteenth Amendment. *Id.* The Supreme Court's ruling in *Parratt* indicates that an adequate State remedy may satisfy the requirements of procedural due process when the plaintiff alleges a deprivation of liberty or property. Subsequent courts have applied the *Parratt* rule to deprivations of liberty and property. See *Temple v. Marlborough Div. of the Dist. Court Dep't,* 395 Mass. 117, 126, 479 N.E.2d 137 (1985) (postdeprivation safeguards afforded involuntarily committed plaintiff satisfy procedural due process requirements of Fourteenth Amendment). See also *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3203-3204, 82 L.Ed.2d 393 (1984); *Ingraham v. Wright,* 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). In reaching its conclusion in *Parratt,* however, the Court clearly indicated that the availability of a postdeprivation remedy, although relevant to the issue of procedural due process, would not be relevant to the alleged violation of substantive constitutional rights. "[R]espondent's claims differ from the claims *354 which were before us in *Monroe v. Pape, supra,* which involved violations of the Fourth Amendment, and the claims presented in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), which involved alleged violations of the Eighth Amendment. Both of these Amendments have been held applicable to the States by virtue of the Fourteenth Amendment. ... Respondent here refers to no other right, privilege, or immunity secured by the Constitution or federal laws other than the Due Process Clause of the Fourteenth Amendment *simpliciter.*" (Citations omitted.) *Parratt, supra,* 451 U.S. at 536, 101 S.Ct. at 1913. The Supreme Court limited its holding and discussion in *Parratt* to procedural due process claims under 42 U.S.C. § 1983.

Numerous courts which have confronted the issue since *Parratt* have held that the availability of a State remedy does not bar a § 1983 claim where the plaintiff alleges a violation of a substantive constitutional right. See, e.g., **8*Williams v. St. Louis,* 783 F.2d 114, 118 (8th Cir.1986) (equal protection); *Gilmere v. Atlanta,* 774 F.2d 1495, 1501

(11th Cir.1985), cert. denied, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986) (police brutality "shocks the conscience"); *Augustine v. Doe,* 740 F.2d 322, 326 (5th Cir.1984) (unreasonable search and seizure); *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 872 (7th Cir.1983) (unreasonable seizure). See also *Hall v. Tawney,* 621 F.2d 607, 613 (4th Cir.1980) (corporal punishment); *Temple, supra,* 395 Mass. at 130-131, 479 N.E.2d 137 (specifically noting that court not confronted with substantive due process claim). Unlike procedural due process, which permits the deprivation of life, liberty, or property when such deprivation comports with due process of law, substantive due process imposes absolute limits on State action, irrespective of what procedures are provided. See *Gilmere, supra* at 1500; *Augustine, supra* at 326-327. See also *Parratt, supra,* 451 U.S. at 545, 101 S.Ct. at 1918 (Blackmun, J., concurring) ("there are certain governmental actions that even if undertaken with a full panoply of procedural protection, are, in and of themselves, antithetical to fundamental notions of due process"). Where the right asserted stems from a substantive constitutional guarantee, the availability of a postdeprivation remedy under *Parratt* is of no consequence, because the constitutional violation exists independent of any *355 procedures available to redress the deprivation. [FN11] See generally Wells & Eaton, Substantive Due Process and the Scope of Constitutional Torts, 18 Ga.L.Rev. 201, 222-223 (1984).

> FN11. The application of *Parratt* outside of the procedural due process context would emasculate 42 U.S.C. § 1983, as a meaningful Federal remedy. See *Augustine, supra* at 326-327; *Frost v. City & County of Honolulu,* 584 F.Supp. 356, 363 (D. Hawaii 1984). Since it is hard to imagine a violation of substantive due process which would not provide a concomitant remedy under State law, most if not all Federal civil rights claims under 42 U.S.C. § 1983, would in effect be precluded by a novel and unintended form of State law preemption.

Because the plaintiff alleges a violation of the decedent's right to substantive due process under the Fourteenth Amendment, her claim under 42 U.S.C. § 1983 is not barred by the availability of a remedy for wrongful death under G.L. c. 229, § 2.

*3. Punitive Damages.*

[7][8] The defendants argue that there was insufficient evidence to submit the issue of punitive

damages to the jury.     We disagree.     Punitive
damages are recoverable in a § 1983 suit where the
defendant's conduct is motivated by an evil motive or
intent, or where it involves reckless or callous
indifference to the plaintiff's federally protected
rights.  Smith v. Wade, 461 U.S. 30, 50-51, 103 S.Ct.
1625, 1637-1638, 75 L.Ed.2d 632 (1983).  [FN12]
Clark v. Taylor, 710 F.2d 4, 14 (1st Cir.1983).
There was evidence that defendant McMullan, the
officer who placed Sandra Smigiel in protective
custody, violated department regulations clearly
promulgated for safety and protection of detainees:
first, by failing to attempt to transfer an intoxicated
person to a treatment facility; and then, by placing an
unconscious person in a cell.     There was also
evidence that defendant Dudek, the house officer on
duty the night of Sandra Smigiel's detention, ignored
the other prisoners' cries for help, and replied with
profanity and a racial epithet.  The police officers in
their testimony denied these contentions, but the jury
were, of course, free to disbelieve *356 the police.
Thus, there was evidence of reprehensible conduct,
shocking to the conscience and offensive to all
standards of common decency, which clearly rises to
the threshold level of "callous disregard" for the
decedent's substantive due process rights, and the
judge did not err in submitting the issue of punitive
damages to the jury.

> FN12. In Smith v. Wade, supra, 461 U.S. at
> 56, 103 S.Ct. at 1640; the Supreme Court
> upheld an award of punitive damages in
> factual circumstances analogous to this case,
> where a correctional officer failed to protect
> an inmate from beatings and sexual assault
> by his cellmates.

Judgments affirmed.

398 Mass. 343, 497 N.E.2d 1

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

CIVIL ACTION #04-12700 RCL

| | |
|---|---|
| **MARILYN SCHLOSSBERG** AS ADMINISTRATRIX OF THE ESTATE OF FAYE SCHLOSSBERG, **MARILYN SCHLOSSBERG**, INDIVIDUALLY, **ROBERT S. SCHLOSSBERG**, INDIVIDUALLY, and **ALAN G. SCHLOSSBERG**, INDIVIDUALLY <br><br> Plaintiffs <br><br> v. <br><br> **TOWN OF NEWBURY,** **ROGER MERRY, CHIEF OF POLICE** in his Individual and Official Capacities **JOHN R. LUCEY JR.,** in his Individual and Official Capacities **MICHAEL J. FRAYLER,** in his Individual and Official Capacities **PEGGY OLSON,** in her Individual and Official Capacities, **KEVIN MARTIN,** in his Individual and Official Capacities. <br> Defendants | * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * |

### CERTIFICATE OF SERVICE

I, Michael D. Rubenstein, attorney of record for the Plaintiffs in the within captioned matter, hereby certify that I have served a true copy of the Plaintiff's Opposition to Defendant, Kevin Martin's Motion to Dismiss Pursuant to Rule 12(B)(6) on the following individuals:

Kenneth H. Naide, Esq.         John J. Lang, Esq.
Bonner, Kiernan, Trebach & Crociata    Lang & Associates
One Liberty Square              220 Broadway, Suite 105
Boston, MA  02109              Lynnfield, MA  01940

either in hand or by first class mail, postage prepaid.

Signed under the pains and penalties of perjury this 22nd day of May, 2005.

MICHAEL D. RUBENSTEIN
ATTORNEY AT LAW

1725 REVERE BEACH PARKWAY
EVERETT, MASSACHUSETTS 02149
TEL: (617) 387-3548
'X: (617) 387-4416

_Michael D. Rubenstein_
Michael D. Rubenstein, Esq.